THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SUN LIFE ASSURANCE COMPANY OF CANADA, | CASE NO. C16-0799-JCC |
| Plaintiff-in-Interpleader, | ORDER |
| v. | |
| MARYANNAH O'CONNOR and THERESA WYSONG, | |
| Defendants-in-Interpleader. | |

This matter comes before the Court on Defendant-in-Interpleader Theresa Wysong's motion for summary judgment (Dkt. No. 44) and motion to strike (Dkt. No. 46). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS in part and DENIES in part both motions for the reasons explained herein.

I.  **BACKGROUND**

This is an interpleader action concerning the proceeds of a life insurance policy on David O'Connor ("Decedent"), who passed away on July 22, 2015. (*See* Dkt. No. 1.) At the time of his death, Decedent's daughter Maryannah O'Connor ("O'Connor") was the named beneficiary of the policy. (Dkt. No. 1-1 at 27.) Decedent's wife, Theresa Wysong ("Wysong"), claims that she is entitled to the insurance proceeds because the policy was purchased with community property

and O'Connor exploited Decedent into naming her the beneficiary. (*See generally* Dkt. No. 44.) The policy's insurer, Sun Life Assurance Company of Canada ("Sun Life"), filed this interpleader action, deposited $150,000 in the Court's registry, and has since been dismissed from the lawsuit. (*See generally* Dkt. No. 27.)

After dating for three years, Decedent and Wysong were married in April 2015. (Dkt. No. 46-2 at 1.) Decedent suffered from pulmonary fibrosis, which required Wysong to take care of him. (*Id*. at 2.) Shortly after they married, Decedent provided Wysong with a durable power of attorney to conduct his affairs. (*Id*.) Initially, the couple lived together at Wysong's home, but on May 14, 2015, Decedent left the house and began living with his adult children John and Rafael O'Connor. (*Id*.)

The parties dispute the circumstances under which Decedent left the home. Wysong asserts that Decedent's daughter Rose "came to our house and took David away while I was working." (*Id*.) Wysong further alleges that "[she] was not allowed to [] see my husband because his children prevented me from visiting him . . . ." (*Id*.) O'Connor, on the other hand, states that Decedent wanted to leave Wysong because she was mistreating him. (*See generally* Dkt. Nos. 45-2, 45-3, 45-4.) According to Decedent's children, Wysong had been verbally and physically abusive to their father, and Decedent chose to voluntarily live apart from her. (*Id*.)

It is undisputed, however, that Decedent and Wysong did not reside together from May 14, 2015 until his death a little over two months later. (Dkt. No. 46-2 at 2.) Decedent had a group life insurance policy through Sun Life that was paid for by his former employer and that initially named Wysong as the sole beneficiary. (*Id*. at 2.) When Decedent turned 65 in late May, the life insurance policy converted from a group to individual plan, which required him to begin paying the monthly premiums. (*Id*. at 2–3; Dkt. No. 1-1 at 23–26.) On July 2, 2018, Decedent renewed the Sun Life policy for $150,000 of coverage, and named O'Connor, not Wysong, as the sole

primary beneficiary.[1] (Dkt. No. 1-1 at 23–26.) Decedent included a check for the first premium with his renewal application. (*Id*.)

Decedent was taken to the hospital on July 20, 2018 for complications related to his pulmonary fibrosis. (Dkt. No. 45-4 at 3.) Decedent passed away at the hospital two days later. (*Id*.) On the day he died, Decedent signed, and had notarized, a document that both revoked Wysong's power of attorney regarding the Sun Life insurance policy, and reiterated that O'Connor was the primary beneficiary. (Dkt. No. 44-4 at 26.) Wysong and O'Connor filed claims on the Sun Life policy following Decedent's death. (Dkt. No. 1-1 at 27–35.)

## II. DISCUSSION

### A. Interpleader

Cases brought in interpleader are resolved in two stages. *See First Interstate Bank of Or., N.A. v. U.S. By & Through I.R.S.*, 891 F. Supp. 543, 546 (D. Or. 1995). First, the Court must determine whether the interpleader device is appropriate to relieve a plaintiff stakeholder from liability. *Id.* Second, the Court addresses the merits of the dispute between the defendant claimants. *Id*. Here, the Court concluded the first stage of interpleader when it dismissed Sun Life from the lawsuit. (*See* Dkt. No. 27). The Court must now address Wysong's motion for summary judgment regarding her claim to Decedent's insurance proceeds. Since this action is based on diversity jurisdiction, Washington law controls the parties' dispute. *See Ins. Co. N. Am. v. Fed. Express Corp.*, 189 F.3d 914, 919 (9th Cir. 1999).

### B. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v.*

---

[1] Decedent listed his son John O'Connor as a contingent beneficiary. (Dkt. No. 1-1 at 24.)

*Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quoting Fed. R. Civ. P. 56(e)). When the party moving for summary judgment also bears the burden of persuasion at trial, "to prevail on summary judgment it must show that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008).

**C.    Wysong's Motion for Summary Judgment**

Wysong makes two overarching claims for summary judgment. First, she asserts that Washington's community property laws entitle her to no less than one half of Decedent's insurance proceeds. (Dkt. No. 44 at 5–6.) Second, she asserts that she is entitled to the entire policy because O'Connor and her siblings exploited Decedent into removing Wysong as the sole beneficiary. (*Id.* at 7–8.)

1.    <u>Community Property Claim</u>

Wysong argues that since Decedent's life insurance policy was paid with community funds, as a surviving spouse, she is entitled to no less than one half of the proceeds.[2] (Dkt. No. 44 at 4–5.) Under Washington law, "[a] surviving spouse has a community property interest in a life insurance policy only to the extent that community funds were used to purchase the policy."

---

[2] Wysong makes two other community property-based arguments that she is entitled to the entire policy. First, she cites to cases in which courts have overridden a beneficiary designation where it conflicts with an existing community property agreement. (Dkt. No. 44 at 6.) Those cases are irrelevant because Decedent and Wysong did not have such an agreement. Second, Wysong suggests that Revised Code of Washington section 48.18.440(2) required Decedent to get Wysong's consent prior to changing the beneficiary on his policy. Under that law, when a spouse designates certain family members as a beneficiary of an insurance policy there is a rebuttable presumption that the other spouse consented to the designation. The law does not, however, *require* a spouse to have the consent of the other spouse when he or she designates someone other than the spouse as a beneficiary. *See Francis v. Francis*, 573 P.2d 369, 372 (Wash. 1978). In fact, *Francis* holds that a spouse may designate a beneficiary to his or her portion of a life insurance policy without the other spouse's consent. *Id.*

ORDER
C16-0799-JCC
PAGE - 4

*Aetna Life Ins. Co. v. Bunt*, 754 P.2d 993, 995 (Wash. 1988) (citing *Francis*, 573 P.2d at 372). Courts determine a spouse's entitlement to insurance proceeds by looking to "the character of the funds used to pay the [insurance] premium for the most recent term." *Aetna Life Ins. Co. v. Wadsworth*, 689 P.2d 46 at 50 (Wash. 1984); *see also Bunt*, 754 P.2d at 995 ("if community funds were not used to pay the last premium, there is no community interest in the policy.")

The undisputed evidence supports Wysong's assertion that the final policy premiums were paid from the couple's joint bank account. (Dkt. No. 44-2 at 1.) There is no dispute that the couple was legally married when Decedent made the final premium payment on July 2, 2015. (Dkt. Nos. 44-4 at 28–30; 44-1 at 1.) The evidence also shows that the premium was paid to Sun Life from a joint bank account Decedent and Wysong had at Skagit Bank. (*Id.*)

O'Connor provides testimony from Decedent's son Israel who asserts that he and his siblings agreed to pay Decedent's insurance premiums once he made O'Connor the beneficiary. (Dkt. No. 45-5 at 3.) Notwithstanding this alleged agreement, Israel's own testimony demonstrates that the last premium was paid by Decedent: "[t]he month before we started paying, my dad paid with a check to set up the account with his banking route number and account number to set up the automatic withdrawal." (*Id.*) Decedent submitted the final payment via check on July 2, 2015, and passed away about three weeks later. (Dkt. Nos. 44-4 at 28–30; 44-2 at 2.) Thus, the record does not support the allegation that someone other than Decedent paid the final premium.

O'Connor alternatively argues that the funds used to pay the final premium were not community property because at the time of payment Decedent and Wysong were living separate and apart. (Dkt. No. 45 at 11.) Under Washington law, "[w]hen spouses or domestic partners are living separate and apart, their respective earnings and accumulations shall be the separate property of each." Wash. Rev. Code § 26.16.140. Thus, courts must distinguish "between a 'marital' and a 'community' relationship, the latter concept encompassing more than mere satisfaction of the legal requirements of marriage." *Bunt*, 754 P.2d at 996. Physical separation is

not enough, by itself, to terminate the community relationship, and the marriage must be "for all practical purposes 'defunct'" *Id.* (quoting *Rustad* 377 P.2d at 414). The Washington Supreme Court has held that a marriage is defunct when:

> [B]oth parties to the marriage no longer have the will to continue the marital relationship. In other words, when the deserted spouse accepts the futility of hope for restoration of a normal marital relationship, or just acquiesces in the separation, the marriage is considered 'defunct' so that the 'living separate and apart' statute applies.

*In re Marriage of Short*, 890 P.2d 12, 15 (Wash. 1995). The person asserting that the marriage is defunct must establish that fact by clear and convincing evidence. *Oil Heat Co. of Port Angeles, Inc. v. Sweeney*, 613 P.2d 169, 171 (Wash. Ct. App. 1980).

Wysong points to several undisputed facts that demonstrate the marriage was not defunct when Decedent paid the final insurance premium. Although the couple lived apart for the two and a half months before Decedent's death, they remained legally married and there is no evidence in the record that either took steps to file for divorce.[3] (Dkt. No. 46-2 at 1–2.) During their separation, Wysong intermittently talked on the phone with Decedent and visited him in the hospital the day before he died. (*Id.*; Dkt. No. 45-4 at 2–3.) On another occasion when Decedent was having a medical emergency, Wysong tried to visit him but John O'Connor would not let her in his house. (Dkt. Nos. 44-2 at 3, 45-2 at 3, 45-4 at 3.) Following this incident, Wysong attempted to arrange hospice care for Decedent, but he was apparently against the idea. (Dkt. Nos. 44-2 at 3, 45-5 at 2.) In addition, Wysong held a durable power of attorney to conduct Decedent's affairs until the day he died. (Dkt. No. 44-4 at 1, 30.)

O'Connor argues that the marriage was defunct when Decedent paid the final premium on July 2, 2015. (Dkt. No. 45 at 12.) Decedent's children state that they removed their father

---

[3] Raphael O'Connor states in his declaration that Decedent "got divorce papers but never filled them out." (Dkt. No. 45-3 at 3.) Israel O'Connor, by contrast, states that during the period Decedent was living apart from Wysong he knew "my dad was trying to patch things up with Theresa." (Dkt. No. 45-5 at 2.)

from Wysong's home at his request.[4] (Dkt. No. 45-2 at 2.) They suggest that Wysong was verbally, physically, and emotionally abusive to Decedent, which caused him to leave. (*Id*.; Dkt. No. 45-4 at 1–2.) Rose and John O'Connor described Decedent as being "too weak to walk" when he left Wysong's house because she had malnourished and refused to take care of him. (Dkt. Nos. 45-2 at 3, 45-4 at 1–2.) Decedent's children state that he voluntarily lived at his son John's house and argued with Wysong when they would talk on the phone. (*Id*.)

Even accepting all of O'Connor's evidence as true, the Court cannot conclude that Wysong's marriage was defunct at the time Decedent paid the final insurance premium. The undisputed evidence does not support that Wysong no longer had the will to continue the marital relationship or that she acquiesced in the separation. *See In re Marriage of Short*, 890 P.2d at 15. Despite living apart for two and a half months, Wysong and Decedent continued to talk on a regular basis, and saw each other before Decedent passed away. Importantly, there is no evidence that either spouse took steps to formally dissolve their marriage.

The Court's determination that the marriage was not defunct is consistent with other Washington cases addressing this issue. *See, e.g.*, *Seizer v. Sessions*, 940 P.2d 261, 269 (Wash. 1997) (marriage not defunct where wife was indefinitely committed to a mental institution and husband moved away and started a new relationship); *Bunt*, 754 P.2d at 996 (marriage defunct where couple was living apart for 11 months and one spouse had filed a dissolution petition). For those reasons, the Court GRANTS Wysong's motion for summary judgment regarding her claim that she is entitled to no less than one half of Decedent's insurance policy.

### 2. Financial Exploitation and Undue Influence Claims

Wysong additionally argues that she is entitled to all of Decedent's insurance proceeds because Decedent was exploited by O'Connor and her siblings into removing Wysong as the

---

[4] The Court notes that much of the evidence O'Connor provides regarding Decedent's decision to leave Wysong's house are Decendent's alleged statements, many of which would be inadmissible hearsay. *See* Fed. R. Ev. 801 and 802.

insurance beneficiary. Wysong asserts that her position is supported by Washington's so-called "slayer statute." *See* Wash. Rev. Code § 11.84. Of relevance to this case, the slayer statute provides that "[i]nsurance proceeds payable to the slayer or abuser as the beneficiary or assignee of any policy or certificate of insurance on the life of the decedent, or as the survivor of a joint life policy, shall be paid instead to the estate of the decedent . . . ." *Id*. at 11.84.100. An "abuser" is "any person who participates, either as a principal or an accessory before the fact, in the willful and unlawful financial exploitation of a vulnerable adult." *Id*. at 11.84.010. To determine whether a person is considered an abuser, "the court must find by clear, cogent, and convincing evidence that: (a) The decedent was a vulnerable adult at the time of the alleged financial exploitation took place; and (b) The conduct constituting financial exploitation was willful action or willful inaction causing injury to the property of the vulnerable adult." *Id*. at 11.84.160.

Wysong asserts that both O'Connor and John O'Connor were abusers of Decedent who was a vulnerable adult at the time he switched beneficiaries. (Dkt. No. 44 at 7–8.) For purposes of this case, it is irrelevant whether John O'Connor was an abuser because he was merely a contingent beneficiary of the insurance policy and will not receive any of the proceeds. (Dkt. No. 44-4 at 29.) The question for the Court to determine, then, is whether O'Connor was an abuser by willfully acting to make herself the beneficiary of Decedent's life insurance policy.

The undisputed evidence demonstrates that O'Connor was not an abuser under the slayer statute. As an initial matter, Wysong has no personal knowledge of the circumstances surrounding Decedent's decision to make O'Connor the policy's sole beneficiary. Wysong was not present on July 2, 2015 when Decedent completed and signed the change of beneficiary form. (Dkt. No. 46-2 at 3.) She did not speak with Decedent about the change, and was completely unaware he had switched beneficiaries until after his death. (*Id*.) Wysong's testimony about O'Connor's role in Decedent's decision to make her the sole beneficiary is entirely speculative. (Dkt. No. 46-2 at 3) ("It is my firm belief that David's children exerted a negative influence over David to change the primary beneficiary to that of his daughter Maryannah

O'Connor under the Policy . . . .") Furthermore, Wysong does not provide testimony from anyone else that supports her theory that O'Connor was an abuser. (*See generally* Dkt. No. 44.)

Nor does Wysong present clear and convincing evidence that O'Connor "financially exploited" Decedent. Financial exploitation means "the illegal or improper use, control over, or withholding of the property, income, resources, or trust funds of the vulnerable adult by any person or entity for any person's or entity's profit or advantage other than for the vulnerable adult's profit or advantage." Wash. Rev. Code § 74.34.020(7). Wysong characterizes Decedent's decision to make his daughter the sole beneficiary as "financial exploitation" but there is no evidence that O'Connor caused Decedent to make the change. O'Connor was neither present nor involved with Decedent's decision to leave Wysong's home and move in with John O'Connor. (Dkt. No. 45-1 at 4.) O'Connor was serving in the Navy in San Diego during the time Decedent was separated from Wysong and she saw her father on only a few occasions. (*See generally* Dkt. No. 45-1.) In her declaration, O'Connor states that she was the only person present when Decedent completed the change of beneficiary paperwork, Decedent was cognizant of what he was doing, and neither she nor her siblings told him to change the beneficiaries. (*Id.* at 3.)

Moreover, the Court does not view Decedent's decision to switch beneficiaries as causing an "injury to the property of the vulnerable adult." Wash. Rev. Code §11.84.160. Decedent was presented with the opportunity to change beneficiaries because Sun Life had informed him that he had to convert form a group to individual policy. (Dkt. Nos. 45-1 at 2, 46-2 at 2.) Decedent's decision to name O'Connor as the beneficiary certainly caused a financial injury to Wysong, but there is no evidence to suggest that Decedent was harmed by his decision. The fact that Decedent subsequently revoked Wysong's power of attorney regarding the Sun Life insurance policy—a decision which O'Connor was not involved with—only reaffirms that Decedent intended to make O'Connor the beneficiary.[5]

---

[5] A third-party notary witnessed Decedent sign the revocation before he died. (Dkt. No. 45-7 at 1–2.)

For the first time in her reply brief, Wysong argues that Decedent's children unduly influenced him into changing the insurance beneficiaries. (Dkt. No. 46 at 8–9.) The Washington Supreme Court has described undue influence as "tantamount to force or fear which destroys the testator's free agency and constrains him to do what is against his will." *Matter of Estate of Lint*, 957 P.2d 755, 764 (Wash. 1998). The party asserting undue influence has the burden of proof by clear, cogent, and convincing evidence. *In re Estate of Eubank*, 749 P.2d 691, 694 (Wash. Ct. App. 1988).

Wysong suggests that Decedent's children "forcibly removed" him from his house and isolated him from Wysong, which led Decedent to name O'Connor as the sole beneficiary. (Dkt. No. 46 at 8–9.) Wysong argues that the Court should apply a presumption of undue influence because O'Connor had a confidential relationship with Decedent, helped him fill out the change of beneficiary forms, and stood to receive all of the insurance proceeds. (*Id.*)

O'Connor presents evidence, however, that directly contradicts Wysong's undue influence claim. As previously noted, O'Connor had limited contact with Decedent before he passed away and was not involved with his decision to leave Wysong's house. (Dkt. No. 45-1 at 2.) All of Decedent's children have stated that he enjoyed living with John O'Connor for the two and a half months before he died. (Dkt. Nos. 45-1 at 3–4; 45-2 at 3–4; 45-3 at 2–3; 5-4 at 2–4.) By all accounts, Decedent's sons John and Rafael were taking care of him during the time he was living away from Wysong. (*Id.*) In light of this evidence, Wysong has not demonstrated that the undisputed facts show O'Connor unduly influenced Decedent.

For the above reasons, Wysong's motion for summary judgment regarding her claim that she is entitled to the entire life insurance policy is DENIED.

### D. Wysong's Motion to Strike

Wysong asks the Court to strike O'Connor's entire response brief or, in the alternative, to disallow O'Connor from making a cross-motion for summary judgment. (Dkt. No. 46 at 2–3.)

O'Connor filed a surreply asking the Court to deny the motion to strike. (Dkt. No. 48.)[6]

Wysong asserts that the Court should strike O'Connor's response pursuant to Federal Rule of Civil Procedure 37(c)(1) because O'Connor did not disclose the identity or testimony of witnesses who provided declarations in support of her opposition to summary judgment. (Dkt. No. 46 at 2.) Without awaiting a request, a party must disclose the names, contact information, and subject of the testimony of witnesses who will support its claims or defenses. Fed. R. Civ. P. 26(a)(1). "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Courts enjoy wide latitude to issue sanctions under Rule 37. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).

Wysong asserts that she has been "severely prejudiced in discovery thus far due to the preclusion of this crucial information regarding potential witnesses to this matter." (Dkt. No. 46 at 3.) O'Connor counters that Wysong herself did not provide any initial disclosures or conduct any discovery. (Dkt. No. 48 at 1.) Moreover, Wysong has submitted several of her own declarations—the earliest from October 2016—that reference many of the witnesses that provided declarations in support of O'Connor's response to summary judgment.[7] (*Id*. at 2.)

The Court concludes that O'Connor's failure to disclose the identity of witnesses should not entirely preclude her from using that testimony at summary judgment or trial. First, O'Connor's non-disclosure can be viewed as substantially justified because Wysong also did not provide initial disclosures. (Dkt. Nos. 44-3, 48.) In addition, Wysong's declarations make clear

---

[6] O'Connor's surreply was properly filed in accordance with Local Civil Rule 7(g).

[7] O'Connor submitted the declarations of herself, Rose Wheeler (*née* O'Connor), Rafael O'Connor, John O'Connor, Israel O'Connor, Patricia Gjesdal, Brandi Dellinger, Christopher O'Connor, and April O'Connor. (*See* Dkt. Nos. 45-1–45-9.) In her declarations, Wysong has named and discussed relevant facts regarding the testimony of O'Conner, Rose O'Connor, John O'Connor, Israel O'Connor, and Raphael O'Connor. (*See* Dkt. Nos. 44-2, 46-2, 48-2.)

that she not only knew the identities of some of O'Connor's witnesses, but was intimately acquainted with them. (*See generally* Dkt. Nos. 44-2, 46-2, 48-2.) Indeed, the majority of these witnesses are her step-children. Wysong's awareness of these witnesses and their knowledge of the events at issue make O'Connor's non-disclosure harmless. The Court cannot conclude that Wysong would be prejudiced by considering the testimony of witnesses that she herself characterizes and disputes in support of summary judgment. A contrary ruling would be unjust. Wysong's motion to strike O'Connor's response is therefore DENIED.

The Court will consider the declarations of only those witnesses who Wysong previously identified and discussed in her declarations. Those witnesses are: O'Connor, Rose O'Connor, John O'Connor, Isarael O'Connor, and Raphael O'Connor. The Court will also consider the declaration of Brandi Dellinger, who notarized Decedent's revocation of power of attorney before he died.[8] The Court will not, however, consider the declarations of Patricia Gjesdal, Christopher O'Connor, or April O'Connor because their identities were not disclosed by O'Connor, nor does the record suggest Wysong was aware of their testimony regarding this lawsuit.

Next, the Court must address whether it should consider O'Connor's cross-motion for summary judgment, which she included in her response brief. Wysong argues that O'Connor's request for summary judgment is untimely. (Dkt. No. 46 at 2.) Although the dispositive motions deadline was March 9, 2018, O'Connor did not make a cross-motion for summary judgment until she filed her response brief on April 2, 2018. (Dkt. No. 45.) O'Connor tries to skirt the untimeliness of her cross-motion, by asking the Court to "use its powers under FRCP 56(f) to grant summary judgment in favor of Mary." (Dkt. No. 45 at 18.)

Parties may not file dispositive motions outside the deadlines established in the Court's scheduling order unless good cause is shown. *See* Fed. R. Civ. P. 16(b). A district court's

---

[8] Dellinger was identified in a document Wysong has possessed since the start of this litigation. (*See* Dkt. No. 44-4.)

determination of good cause is primarily concerned with "the diligence of the party seeking the extension." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992). Here, O'Connor offers no explanation for why she failed to file her cross-motion prior to the dispositive motions deadline. The Court concludes that O'Connor has not demonstrated good cause to justify her untimely cross-motion for summary judgment. Therefore, the Court will only consider O'Connor's motion and supporting declarations in opposition to Wysong's motion for summary judgment.

Under Federal Rule of Civil Procedure 56(f), a district court may "grant summary judgment for a nonmovant" after "giving notice and a reasonable time to respond." Fed. R. Civ. P. 56(f)(1). This case is currently scheduled for a trial before the Court on May 14, 2018. (Dkt. No. 40.) Based on the Court's summary judgment order, the only remaining issue for trial is Wysong's claim that she is entitled to all of the insurance proceeds because O'Connor unduly influenced Decedent into making her the sole beneficiary of the Sun Life policy. At trial, Wysong will be required to prove by clear, cogent, and convincing evidence that O'Connor unduly influenced Decedent. *In re Estate of Eubank*, 749 P.2d at 694.

Based on the evidence presented at the summary judgment, the Court is skeptical that Wysong can meet her burden at trial. Pursuant to Rule 56(f), Wysong is ORDERED to show cause why the Court should not grant summary judgment in favor of O'Connor, awarding her one half of the insurance proceeds at issue. In her response, Wysong shall identify the material facts that demonstrate O'Connor unduly influenced Decedent. Wysong's response shall address only the issue of undue influence and be no longer than six double spaced pages.

## III.     CONCLUSION

For the foregoing reasons, Wysong's motion for summary judgment (Dkt. No. 44) and motion to strike (Dkt. No. 46) are GRANTED in part and DENIED in part. In accordance with the above rulings, the Court ORDERS the following:

(1) In ruling on Wysong's summary judgment motion, the Court may consider the

declarations of Maryannah O'Connor, Rose O'Connor, John O'Connor, Rafael O'Connor, Israel O'Connor, and Brandi Dellinger. The Court may not consider the declarations of Patricia Gjesdal, Christopher O'Connor, and April O'Connor.

(2) O'Connor's cross-motion for summary judgment is stricken as untimely.

(3) Wysong is entitled to no less than one half of the remaining insurance proceeds.

(4) Wysong's motion for summary judgment on her claims under Washington's slayer statute and undue influence is DENIED.

(5) No later than 14 days from the date of this order, Wysong will submit a response pursuant to Federal Rule of Civil Procedure 56(f) as explained in part II.D *supra*.

On its own motion, the Court CONTINUES the trial in this matter to August 20, 2018.

DATED this 16th day of April 2018.

John C. Coughenour
UNITED STATES DISTRICT JUDGE